AUSA:  Barbara Lanning          Telephone:  (313) 226-9100
AO 106 (Rev. 04/10)  Application for a Search Warrant  Special Agent:  Ashley Nevans, FBI  Telephone:  (313) 268-8871

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

In the Matter of the Search of                )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)*   )      Case No.  19-mc-51619-27
                                               )
1110 South Deacon Street, Detroit, MI          )
(More fully described in Attachment A)         )
                                               )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See ATTACHMENT A.

located in the _____ Eastern _____ District of _____ Michigan _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g) | Felon in possession of a firearm; |
| 21 U.S.C. §§§841, 844 846 | Distribution, possession, & conspiracy to distribute controlled substances |

The application is based on these facts:

See attached AFFIDAVIT.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ashley Nevans, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date:  April 22, 2021
_____
*Judge's signature*

City and state:  Detroit, MI

Hon.  David R. Grand,       U. S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Special Agent Ashley Nevans, assigned to the Federal Bureau of Investigation (FBI) Detroit's Violent Gang Task Force, being duly sworn, depose and state as follows:

### I.     Introduction and Agent Background

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI). As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.     I have been employed as an FBI Special Agent since 2019. I am currently assigned to the Detroit FBI Violent Gang Task Force (VGTF) and participate in investigations into street gangs committing various violations of federal law, including narcotics and weapons trafficking and violent crime. Prior to my current work assignment, I was an FBI Intelligence Analyst assigned to the El Paso Field Office. I have participated in numerous narcotics arrests and joint investigations involving the violation of Federal narcotics laws.

3.     I make this affidavit, in part, based on personal knowledge derived from my participation in this investigation and, in part, based upon information from oral and written reports about this investigation and others that I have received from other

law enforcement officers and Special Agents. I am aware of the following information from several sources, including but not limited to, my own personal observations and participation in this investigation and my review and analysis of oral and written reports.

4.      Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by Special Agents of the FBI or other law enforcement officers. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are among many statements made by others and are stated in substance, unless otherwise indicated. I have not set forth each and every fact learned during the course of this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the requested warrants based on the affidavit

5.      I am conducting an investigation into violations of 18 U.S.C. § 922(g) (felon in possession of a firearm); 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime or crime of violence), and 21 U.S.C. § 841, 844, 846 (distribution, possession, and conspiracy to distribute controlled substances). Based on my investigation, there is probable cause to believe that

evidence related to those offenses is located at the following premises (The "Target Premises"), which is further described below:

A.    1110 South Deacon Street, Detroit, Michigan

6.    I am requesting authority, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search the entire subject premises described in Attachment A, including the residential dwelling, for the items listed in Attachment B as well as instrumentalities, fruits, and evidence of a crime.

7.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(g) (felon in possession of firearm), 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime), and 21 U.S.C. § 841, 844, 846 (distribution, possession, and conspiracy to distribute controlled substances), have been committed, and are continuing to be committed by **DARIUS BRIM** and others, and that evidence, fruits, and instrumentalities of the Target Offenses, further described in Attachment B, will be found in the location to be searched.

**II.    Probable Cause**

8.    Since November 2014, VGTF has conducted an ongoing investigation of the "Hole Riders" criminal street gang, located in Southwest Detroit. Through investigation, VGTF has identified **DARIUS BRIM**, AKA "Dub" and "Lil Dub," as a Hole Riders member. Affiant believes **BRIM** is a heroin and cocaine

distributor operating in the City of Detroit, Michigan. Affiant believes **BRIM** uses the **Target Premises** as one of his residences and to facilitate his narcotics distribution.

     A. <u>THE TARGET PREMISES</u>

    9.    Law enforcement has conducted both electronic and in-person surveillance and on the **Target Premises** between December 2020 and April 2021. On multiple occasions between December 16, 2020 and April 20, 2021, individuals brought AR-style rifles and handguns in and out of the **Target Premises**. Images 9A, 9B, 9C, 9D, and 9E are screenshots from electronic surveillance.



***Image 9A***



*Image 9B*



*Image 9C*



*Image 9D*



*Image 9E*

Image 9E is a screenshot from electronic surveillance taken on April 21, 2020 showing **BRIM** carrying an AR-rifle outside of the **Target Premises**.

10.     In affiant's training and experience, illegal firearms may be found in the **Target Premises** to protect the sellers and to safeguard a narcotic enterprise.

11.     On multiple occasions between December 18, 2020 and March 13, 2021, electronic surveillance captured activities indicative of hand-to-hand narcotics transactions at the **Target Premises**. Law enforcement reviewed the surveillance and identified vehicles arriving at the residence and only stopping for a short period of time, while individuals from inside the **Target Premises** came outside and up to the vehicles. Based on my training and experience, it is reasonable to believe these were narcotics transactions. Images 11A-11D are screenshots of some of the surveillance video capturing these transactions. Image 11A depicts Lawrence Durant—a known member of the Hole Riders—handing something to the vehicle's occupant on December 22, 2020. Image 11B depicts Alanzo Roberson—a known member of the Hole Riders—handing something to the vehicle's occupant on January 4, 2021. Image 11C depicts **BRIM** handing something to the vehicle's occupant on January 26, 2021. Image 11D depicts **BRIM** handing something to the vehicle's occupant on February 23, 2021. Image 11E depicts Roberson handing something to the vehicle's occupant on March 13, 2021.



*Image 11A*



*Image 11B*



*Image 11C*



*Image 11D*



*Image 11E*

12.　In addition to the hand-to-hand transactions described in paragraph 11, on multiple occasions between January 18 and April 9, 2021, electronic surveillance captured short-stay traffic at the **Target Premises**. Short-stay traffic is when an individual enters a premises, stays only for a short period of time, then exits the premises and departs the area.　Affiant reviewed this electronic surveillance and observed multiple occasions where a vehicle pulled up to the **Target Premises** and stopped only long enough for an individual to exit the **Target Premises** and exchange items with individuals in the vehicle. Based on my training and experience, this type of activity is indicative of narcotics trafficking.

13.     Affiant ran the **Target Premises** through open source and law enforcement databases. **BRIM** is currently on probation through MDOC and as of late January 2021, **BRIM** reported to his MDOC Agent that he resides at the **Target Premises**. According to the Wayne County Treasurer's records, property taxes are listed under KEITH LLOYD for the **Target Premises**. Law enforcement has observed **BRIM** at the **Target Premises** many times since June 2020.

14.     Law enforcement conducted surveillance at the **Target Premises** on January 31, 2021, February 26, 2021, and March 28, 2021 and observed **BRIM** checking the mailbox on these days.

15.     On January 12, 2021, law enforcement obtained a Federal search warrant for the location data of the cellular telephone assigned call number 313-888-0223, associated with **BRIM ("BRIM**'s **phone)**. The FBI began receiving location data on January 19, 2021. The FBI has continued to receive location data of the **BRIM'**s phone. Location data shows that **BRIM** regularly returns to the vicinity of the Target Premises after short periods of time elsewhere. **BRIM** often spends the night at his girlfriend's apartment but returns to the **Target Premises**. **BRIM** regularly goes to the **Target Premises** during the day. Based on my training, experience and conversations with other investigators, the location data collected is consistent with the Target Premises being one of **BRIM'**s residences.

B. <u>BACKGROUND ON DARIUS BRIM</u>

16.     **BRIM** is a convicted felon and prohibited from possessing firearms pursuant to 18 U.S.C. §§ 922(g). Brim has a 2018 controlled substance felony conviction from Lenawee County and a 2019 controlled substance felony conviction from Wayne County.

17.     On March 16, 2018 **BRIM** was sentenced to probation for possession of a controlled substance cocaine/narcotic in Lenawee County Circuit Court. The Michigan Department of Corrections (MDOC) supervised **BRIM'**s probation. On September 23, 2019, MDOC agents and Detroit Police Department (DPD) officers conducted a probation compliance check of **BRIM'S** residence at 1110 South Deacon Street, Detroit, Michigan. During the compliance check, officers located a bag of heroin in pressed solid form in **BRIM'S** bedroom. In the officer's experience, the amount of heroin was indicative of narcotics trafficking and was more than a personal use amount.

18.     DPD officers seized **BRIM'S** cell phone when they arrested him for possession of heroin. The cell phone was a black Apple iPhone. On November 5, 2019, agents obtained a federal search warrant to search the contents of **BRIM**'s cell phone. Agents later completed a forensic extraction of the phone.

19.     Affiant has reviewed the forensic extraction of **BRIM**'s cell phone. The cell phone last utilized phone number 313-888-0223. Based on a review of the content, I believe **BRIM** was the user of this cell phone. Brim's device contains texts

and other messages indicative of narcotics trafficking and firearms possession. The following are examples of the text messages and other messages:

    a. On July 11, 2019, an individual texted **BRIM** saying "U got a gram and a half?" **BRIM** responded "Yea wya."

        i. Based on my training and experience, these text messages indicate the individual is asking to purchase narcotics from **BRIM**.

    b. On August 3, 2019, an individual texted **BRIM** saying "I need a hand boy bro" and "Get another one ready half g." **BRIM** responded "Alr."

        i. Affiant knows "boy" to be slang for heroin, "g" to be slang for a gram, and based on my training and experience, these text messages indicate the individual asking to purchase heroin from **BRIM**.

    c. On September 12, 2019, an individual texted **BRIM** saying "I just gotta try to get the 556 boys." **BRIM** responded saying "Alr wen u tryna go shoot these bitches. We gotta test em out." The individual responded with "The nigga I bought em from said they all take 223 bullets but one of em can take 556."

        i.  Based on my training and experience, these text messages indicate the individual and **BRIM** are talking about purchasing rifles.

20.    On November 7, 2019, members of the Metro Narcotics Enforcement Team (MNET) executed a search warrant of **BRIM'S** residence at 1110 South Deacon Street, Detroit, Michigan. During the search of the residence, officers located 4.5 grams of suspected heroin, ammunition, $1,033.00 U.S. currency, multiple digital scales, and a conversion kit with a press containing suspected narcotics residue, among other evidentiary items. **BRIM** was mirandized and interviewed. During the interview, **BRIM** admitted to law enforcement officers that the heroin belonged to him and he was trying to make some extra money.

21.    Through investigation, affiant has identified the Instagram profile "holerida_dub" as being accessed and utilized by **BRIM**. "Holerida Dub" is a known moniker for **BRIM**. Affiant knows this from previous law enforcement reporting and a review of social media. Affiant has reviewed "stories" (short videos or images that can be posted to an Instagram user's account and displayed publicly or to the user's followers in a private account), and other images and videos posted by Instagram User ID "holerida_dub." Affiant compared photographs and videos posted by the user of the "holerida_dub" account to **BRIM**'s driver's license and prior booking photographs. Affiant determined that

14

**BRIM** accessed and utilized the "holerida_dub" account.

22. On September 23, 2020, Instagram user holerida_dub posted a picture of **BRIM** carrying a satchel containing a large number of $100 bills to his Instagram story. *See* Image 22A. **BRIM** does not hold legitimate employment and, therefore, it is reasonable to believe the large sum of U.S. currency was derived from illegal activity, specifically narcotics trafficking.



**Image 22A**

23. On October 22, 2020, Instagram user holerida_dub posted a picture on his Instagram story of **BRIM** holding an AR-style rifle. *See* Image 23A. **BRIM** is a convicted felon, thereby prohibited from possessing firearms. In Image 23A, **BRIM** is the third individual from the left, wearing all black.



*Image 23A*

24.     On January 7, 2021, Instagram user holerida_dub posted a video to his

Instagram story. In the video, **BRIM** has a large amount of cash, comprised mostly

of $20.00 bills. The Instagram video appeared to be taken in a hotel room, in which

**BRIM** had the cash on the floor and was playing Playstation NBA 2K. In the

video, **BRIM** says, "Done trapped this bitch out and play 2k all day." In my

training and experience, in the context of narcotics trafficking, a "trap" is a

location in which narcotics are sold or is the act of selling narcotics. Image 24A is

a screenshot from this Instagram video.



*Image 24A*

25.    On April 7, 2021, Instagram user 30dayz_30nightz (formerly the

holerida_dub account) posted a video on his Instagram story. In the video, there is

a large stack of cash with the caption "It's been a good week. I cnt complain."

Image 25A is a screenshot from this Instagram video.



*Image 25A*

C.  APRIL 22, 2021 SEARCH

26.     On April 21, 2021, Affiant obtained a federal search warrant from the

Honorable David Grand to search the **Target Premises** for firearms. Agents

executed the search warrant the morning of April 22, 2021. While searching the

**Target Premises** for firearms, agents discovered evidence of narcotics

distribution.

27.     While searching the kitchen of the residence, agents discovered digital scales, credit cards in **BRIM's** name with suspected narcotics residue, a .40 caliber Ruger handgun and a loaded .223 magazine to a rifle sitting on top of a cabinet. In the same spot agents also found approximately 50 grams of heroin (including packaging). In affiants training an experience, that amount of heroin is not consistent with personal use and the digital scales and credit cards are indicative of narcotics distribution.

## III.   Training and Experience

### A. <u>DRUG TRAFFICKING AND OPINIONS</u>

28.     Based on training and experience I know the following:

a.     that drug traffickers very often place utilities, registrations, and other assets in the names of others to avoid detection by law enforcement and other government agencies;

b.     that drug traffickers often place residences in other persons' names although the traffickers continue to exercise dominion and control over them;

c.     that it is common for drug traffickers to maintain multiple premises from which their illegal business is conducted. Drug traffickers also store narcotics, narcotics proceeds and records relating to the trafficking of narcotics at their residences and/or businesses and the residences and/or

businesses of their relatives and co-conspirators;

d.      that narcotics traffickers must maintain on hand, large amounts of US Currency in order to maintain and finance their ongoing narcotics business;

e.      that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, passports, and other papers relating to the procurement, distribution, storage, and transportation of controlled substances. These records include the telephone numbers of customers, the amount of controlled substances distributed to various customers, along with running totals of debts owed by those customers. They also maintain paraphernalia utilized to package or repackage controlled substances. These aforementioned items are commonly maintained in locations to which narcotic traffickers have frequent and ready access, i.e. homes, businesses, and automobiles;

f.      that the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the drug traffickers have ready access to them;

g.      that it is common for drug traffickers to conceal contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences and/or businesses for ready access and in order to conceal them from law enforcement authorities;

h.     that persons involved in drug trafficking conceal within their residences and/or businesses, drugs, currency, financial instruments, precious metals, jewelry, automobile titles and other items of value and/or proceeds of drug sales and evidence of financial transactions, or spending of money acquired from engaging in drug trafficking activities and that these items are also secured in safety deposit boxes;

i.     that when drug traffickers have proceeds from the sales of drugs, the traffickers attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize domestic and foreign banks and/or financial institutions and their attended services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, "shell" corporations, and business "fronts." Records of these activities are commonly kept in the drug traffickers' residences and/or businesses;

j.     that drug traffickers commonly maintain addresses, or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their criminal associates in drug trafficking;

k.     that during drug transactions, traffickers take or cause to be taken photographs of themselves, their associates, their property and their product. These traffickers usually maintain these photographs at their residences and/or other properties that they control;

21

l.      that drug traffickers commonly use electronic equipment to aid them in their drug trafficking activities.  This equipment includes, but is not limited to, digital display pagers, mobile telephones, speed dialers, electronic telephone books, electronic date books, computers, computer memory disks, money counters, electronic surveillance equipment, eavesdropping equipment, police radio scanners, and portable communication devices;

m.      that drug traffickers commonly use in the possession, dilution, or distribution of narcotic drugs and non-narcotic controlled substances, adulterants, diluents, packaging, plastic bags, manila envelopes, strainers, measuring spoons, scales, grinders, weights, etc.;

n.      that drug traffickers commonly store narcotics, narcotic proceeds, drug ledgers, hotel receipts, travel documents, bank account records, safety deposit box keys, and records showing the procuring, selling and transporting of controlled substances in vehicles. Drug traffickers also install false compartments in vehicles to conceal these items from law enforcement;

o.      those persons who traffic in controlled substances frequently maintain firearms to protect both the controlled substances and proceeds derived from their sale from other narcotics traffickers and law enforcement authorities.

29.     Based on my knowledge of this investigation and information obtained from open-source and law enforcement databases, information provided by a cooperating witnesses, physical surveillance, and other information, I believe that **DARIUS BRIM** is utilizing the **Target Premises** to store narcotics and cash proceeds from the sale of narcotics, in addition to other evidence of narcotics trafficking.

### B. USE OF CELLULAR TELEPHONES FOR DRUG TRAFFICKING

30.     A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells", enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log", which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and email; taking, sending, receiving and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; accessing and downloading information from the Internet. Wireless telephones

may also include global positioning system ("GPS") technology for determining the location of the device.

31.     Based on my training and experience, and the investigations of other law enforcement officers with whom I have had discussions, I am aware that those involved in the drug trade often use cellular telephones to facilitate drug trafficking. I know that drug traffickers commonly use cellular telephones to store names, numbers, and contact information of other subjects with whom they are involved in these types of crimes. Cellular telephones are used to communicate with other drug dealers, suppliers, couriers, recipients, and co-conspirators. Cellular telephones are likely to reveal the prior drug contacts called, or messages/calls received from the contacts, the names and telephone numbers of drug contacts, messages to/from drug traffickers, photographs of drug locations or activity, and photographs of those involved in the crimes. In this respect, cellular telephones are tools of the drug trade.

   C.  COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC
       ANALYSIS

32.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the **Target Premises**, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media, such as a cell phone.

Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

33.  *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating

system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

34.  *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic

electronic evidence will be on any storage medium in the **Target Premises**
because:

  a.  Data on the storage medium can provide evidence of a file that was
      once on the storage medium but has since been deleted or edited, or of
      a deleted portion of a file (such as a paragraph that has been deleted
      from a word processing file). Virtual memory paging systems can
      leave traces of information on the storage medium that show what
      tasks and processes were recently active.  Web browsers, e-mail
      programs, and chat programs store configuration information on the
      storage medium that can reveal information such as online nicknames
      and passwords.  Operating systems can record additional information,
      such as the attachment of peripherals, the attachment of USB flash
      storage devices or other external storage media, and the times the
      computer was in use. Computer file systems can record information
      about the dates files were created and the sequence in which they were
      created, although this information can later be falsified.

  b.  As explained herein, information stored within a computer and other
      electronic storage media may provide crucial evidence of the "who,
      what, why, when, where, and how" of the criminal conduct under
      investigation, thus enabling the United States to establish and prove

each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic

storage media access, use, and events relating to the crime under

investigation.  Additionally, some information stored within a

computer or electronic storage media may provide crucial evidence

relating to the physical location of other evidence and the suspect.

For example, images stored on a computer may both show a particular

location and have geolocation information incorporated into its file

data.  Such file data typically also contains information indicating

when the file or image was created.  The existence of such image

files, along with external device connection logs, may also indicate

the presence of additional electronic storage media (e.g., a digital

camera or cellular phone with an incorporated camera).  The

geographic and timeline information described herein may either

inculpate or exculpate the computer user.  Last, information stored

within a computer may provide relevant insight into the computer

user's state of mind as it relates to the offense under investigation.

For example, information within the computer may indicate the

owner's motive and intent to commit a crime (e.g., internet searches

indicating criminal planning), or consciousness of guilt (e.g., running

a "wiping" program to destroy evidence on the computer or password

protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

35.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or

absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

36.    *Necessity of seizing or copying entire computers or storage media*.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.

Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

37. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of

the evidence described in the warrant, and would authorize a later review of the

media or information consistent with the warrant.  The later review may require

techniques, including but not limited to computer-assisted scans of the entire

medium, that might expose many parts of a hard drive to human inspection in order

to determine whether it is evidence described by the warrant.

38.     Because it is possible several people share the **Target Premises** as a

residence, it is possible that the **Target Premises** will contain storage media that

are predominantly used, and perhaps owned, by persons who are not suspected of a

crime.  If it is nonetheless determined that that it is possible that the things

described in this warrant could be found on any of those computers or storage

media, the warrant applied for would permit the seizure and review of those items

as well.

### IV.     Conclusion and Request for Sealing

39.     I submit that this affidavit supports probable cause for a warrant to

search the PREMISES described in Attachment A and seize the items described in

Attachment B.

40.     In summary, probable cause exits that the **Target Premises** contains

fruits, instrumentalities, and evidence of federal crimes specifically relating to

violations of 21 U.S.C. §§ 841, 844, 846 (distribution, possession, and conspiracy

to distribute controlled substances), 18 U.S.C. § 922(g)(1) (felon in possession of a

firearm), and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug

trafficking crime) for the following reasons:

    a. **BRIM** utilizes 1110 S. Deacon Street, Detroit, Michigan as one of his

       residences. He reported the address to his MDOC agent, he is

       routinely at the house during the day, and checks the mail when he is

       at the residence.

    b. Law enforcement searched 1110 S. Deacon Street on September 23,

       2019 and November 7, 2019 and found narcotics in the home on both

       occasions. **BRIM** admitted that the narcotics at the residence were his.

    c. As recently as March 13, 2021, law enforcement has observed short-

       stay traffic and hand to hand transactions at 1110 S. Deacon Street,

       consistent with narcotics trafficking.

    d. **BRIM** has advertised his possession of firearms and large sums of

       cash to social media.

    e. Before it was seized by law enforcement in September 2019, **BRIM**

       used his old cell phone (with the same call number as his current cell

       phone) to exchange messages regarding his selling and distribution of

       narcotics and his acquisition of firearms.

    f. Law enforcement observed individuals carrying AR-style rifles and

       handguns into and out of 1110 S. Deacon Street on multiple occasions

between December 16, 2020 and April 20, 2021. And on April 20,

2021 affiant observed **BRIM** carrying an AR-rifle outside of the

**Target Premises**.

41.     It is respectfully requested that this Court issue an order sealing, until

further order of the Court, all papers submitted in support of this application,

including the application and search warrant.  I believe that sealing this document is

necessary because the items and information to be seized are relevant to an ongoing

investigation into the criminal organizations as not all of the targets of this

investigation will be searched at this time.  Based upon my training and experience,

I have learned that online criminals actively search for criminal affidavits and search

warrants via the Internet, and disseminate them to other online criminals as they

deem appropriate, i.e., post them publicly online through the carding forums.

Premature disclosure of the contents of this affidavit and related documents may

have a significant and negative impact on the continuing investigation and may

severely jeopardize its effectiveness .

_____
Ashley Nevans
Special Agent - FBI


Sworn to before me and signed in my
presence and/or by reliable electronic means

_____
Honorable David R. Grand
United States Magistrate Judge
Dated:   April 22, 2021

35

## ATTACHMENT A

## DESCRIPTION OF THE PROPERTY TO BE SEARCHED

The residence with the address **1110 South Deacon Street, Detroit, Michigan**, described further below, as well as any vehicles contained on the property or curtilage.

Two-story white house with white trim. The house is situated on the west side of South Deacon Street between Pleasant and Leonard in the city of Detroit, Michigan. 1110 South Deacon Street is the fourth residence to the north of the intersection of South Deacon Street and Leonard Street. The driveway is located on the south side of the residence.



ATTACHMENT B

THE ITEMS TO BE SEIZED

All items, including documents and records, described below which relate to the unlawful possession of firearms, 18 U.S.C. §§ 922(g), and 924(c); distribution and possession with intent to distribute narcotics controlled substances, 21 U.S.C. §841(a)(1); the unlawful use of communications facilities in commission of narcotics offenses, 21 U.S.C. §843(b); attempts and conspiracies to commit the aforementioned crimes, 21 U.S.C. §§846 and 963, those violations involving DARIUS BRIM and others occurring after September 2019 to wit:

1. Controlled substances and materials and equipment for manufacturing, handling, or distributing controlled substances, including rubber gloves, packaging, plastic bags, manila envelopes, scales and weighing equipment, adulterants, diluents, strainers, measuring spoons, scales, grinders, firearms, ammunition, weapons, and other drug-related paraphernalia;

2. United States or foreign currency and items or instruments used to count or hold this currency, including electronic money counters;

3. any and all literature pertaining to the use, the distribution, or the manufacture of illegal controlled substances;

4. lists and records pertaining to the manufacture, possession, ownership or sales of controlled substances, such as ledgers or tally sheets;

5. documents that identify names, addresses, telephone numbers, or e-mail addresses of: narcotics suppliers, narcotics customers, narcotics co-conspirators, and all individuals involved in the money laundering conspiracy, both witting and unwitting, including buyers and sellers of assets;

6. documents, paperwork, and records relating to transporting controlled-substances and/or currency, including, but not limited to, credit card statements, motel/hotel records, travel itineraries, travel records, cash receipts and airline records, rental car records;

7. cellular telephones including "Smart" phones (e.g., iPhones), and records related to use and/or payment of such phones telephones, including toll records and bills;

8. photographs and (audio, visual, or audio-visual) recordings of controlled substances, of conveyances of controlled substances, or of locations of controlled substances, whether stored electronically on cellular telephones or other electronic storage devices or print copies of such photographs;

9. items of personal property which tend to identify the person(s) in control, possession, or ownership of the property that is the subject of this warrant or the related properties identified in the affidavit (which is incorporated by reference), including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, identification cards and documents, airline tickets and related travel documents, bank books, checks and check registers, and public storage facilities receipts;

10. documents, paperwork, and records identifying assets and the location of assets which are proceeds, or which were potentially purchased with proceeds, from sales of controlled substances, such as, but not limited to, account statements for banks and other financial institutions, real and personal property contracts, deeds, automobile records, automobile titles, automobile registrations, and automobile insurance records, photographs of property, bank records, safety deposit box records and keys, cashier's checks, and wire transfer records, asset purchase records, records of notes and loans, contracts, checking and savings account statements, canceled checks, retained copies of tax returns, records documenting income, records documenting loans and other liabilities that have been satisfied, credit card receipts, property titles, lease agreements, mortgage documents, real property records, receipts or records for purchase of vehicles, precious metals, or jewelry,

11. records of off-site locations to store records, including safe deposit box keys, records and receipts and rental agreements for storage facilities;

12. any lockbox or safe found on the premises;

13. U.S. currency, jewelry, financial instruments, precious metals, cashier checks, money drafts, letters of credit, fine art, and similar assets which are the proceeds of, or likely were purchased with the proceeds of, the sale of controlled substances;

14. any paper, receipt, book, note(s), ledger or similar writing relating to the laundering of drug proceeds or another state or federal criminal offense;

15. any papers, documents, records which identify any asset or any interest in any property, object or thing tending to have real value including, but not limited to, any real property deed, real property tax paperwork, mortgage paperwork, land contract paperwork or similar contract or agreement, bank statement, securities statement, insurance paperwork, automobile title, watercraft title, appraisal paperwork, receipt of purchase for any goods;

16. any financial transaction device, financial instrument, stock certificate(s), bearer bond(s), foreign or domestic currency, bullion of any precious metal, precious gem stone or jewelry, safe deposit box key or other thing which may tend to have value and represent the substitute asset of drug proceeds or other converted criminal proceeds or fruit of any crime, or to be used or intended to be used as an instrument to commit any state or federal crime;

17. communications (including letters, notes, text messages, voice mail messages, and Internet-based messages, e.g., e-mails, Instant Messenger chats/logs, Facebook messages, Instagram photos) between the co-conspirators, including those identified in the affidavit (incorporated by reference), about conspiracy to distribute controlled substances.

18. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AUSA: Barbara Lanning          Telephone: (313) 226-9100
Special Agent:   Ashley Nevans, FBI          Telephone:   (313) 268-8871

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No.  19-mc-51619-27
1110 South Deacon Street, Detroit, MI )
(More fully described in Attachment A) )
)

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____Michigan_____ . *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before     May 6, 2021_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty  .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:       April 22, 2021   9:41 am_____          _David G. N_____
*Judge's signature*

City and state:     Detroit, MI_____          Hon.  David R. Grand,     U. S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>19-mc-51619-27 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____            _____
                                                                              *Executing officer's signature*

                                                                    _____
                                                                              *Printed name and title*